**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SARAH CRADDOCK,

                **Plaintiff,**

    **- against -**

TROOPER NATHAN CHERNEWSKY, TROOPER
ERICA RODRIGUEZ, INVESTIGATOR WILLIAM
HOGENCAMP, AND SUPERINTENDENT KEVIN P.
BRUEN OF THE NEW YORK STATE POLICE
DEPARTMENT,

                **Defendants.**

_____

**COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

**CIVIL ACTION**
**NO.** 1:23-cv-1516 (AMN/CFH)

**HON.** _____

**HON.** _____

       The plaintiff, Sarah Craddock, by her attorney, Lewis B. Oliver, Jr., Esq., of counsel to the Oliver Law Firm, as and for her complaint, does hereby state and allege:

### STATEMENT OF THE CASE

       1.    This is a civil rights action in which plaintiff Sarah Craddock seeks compensatory and punitive damages and redress for violation of her clearly established federal constitutional rights against use of excessive force, not to be detained without probable cause, and malicious prosecution against the defendants New York State Trooper Nathan Chernewsky, New York State Trooper Erica Rodriguez, New York State Trooper Investigator William Hogencamp, and New York State Police Superintendent Kevin P.

Bruen.

## JURISDICTION

2.    Plaintiff's first claim is pursuant to 42 USC 1983 against defendant New York State Trooper Nathan Chernewsky for violation of her clearly established federal constitutional rights to be free from the use of excessive force under the Fourth and Fourteenth Amendments of the United States Constitution.

3.    Plaintiff's second claim is pursuant to 42 USC 1983 against defendant New York State Trooper Erica Rodriguez for violation of her clearly established federal constitutional rights to be free from the use of excessive force under the Fourth and Fourteenth Amendments of the United States Constitution.

4.    Plaintiff's third claim is pursuant to 42 USC 1983 against defendants New York State Trooper Nathan Chernewsky, New York State Trooper Erica Rodriguez in violation of her clearly established federal constitutional rights to be free from illegal detention under the Fourth and Fourteenth Amendments of the United States Constitution.

5.    Plaintiff's fourth claim is pursuant to 42 USC 1983 against defendant New York State Trooper Investigator William Hogencamp for violation of her clearly established federal constitutional rights to be free from malicious prosecution under the Fourth and Fourteenth Amendments of the United States Constitution.

6.    Plaintiff's fifth claim is pursuant to 42 USC 1983 against defendant New York State Police Superintendent Kevin P. Bruen and Trooper Chernewsky and seeks injunctive relief declaring the Superintendent's Commendation Award given to defendant Chernewsky

for his conduct in the shooting of Ms. Craddock is invalid and represents a continuing violation of Ms. Craddock's constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments of the United States Constitution.

7.    This court has original jurisdiction of plaintiff's claims pursuant to 28 USC 1331 since this action seeks redress for the violation of plaintiff's federal constitutional and civil rights.

8.    The plaintiff, Sarah Craddock, is a citizen of New York State, Columbia County, and a resident of this judicial district.

9.    Upon information and belief, all of the defendants are citizens of New York State and residents of this judicial district.

10.    The defendants' violations of Ms. Craddock's rights were committed in Columbia County, New York, within the Northern District of New York.

<u>PARTIES</u>

11.    At all times pertinent to this complaint the plaintiff, Sarah Craddock, resided at her home located at ███████████████████████████████.

12.    At all times pertinent to this complaint, the defendant Trooper Nathan Chernewsky was an officer employed by the New York State Police Department and in doing the acts and things hereafter complained of, he was acting under color of state law and within the scope of said employment and in furtherance of his employer's interests and in his representative capacity as stated. The principal offices of the New York State Police Department are located at Building #22, State Office Campus, 1220 Washington Avenue, Albany, New York 12226-2252.

13.    At all times pertinent to this complaint, the defendant Trooper Erica Rodriguez was an officer employed by the New York State Police Department and in doing the acts and things hereafter complained of, she was acting under color of state law and within the scope of said employment and in furtherance of her employer's interests and in her representative capacity as stated. The principal offices of the New York State Police Department are located at Building #22, State Office Campus, 1220 Washington Avenue, Albany, New York 12226-2252.

14.    At all times pertinent to this complaint, the defendant Investigator William Hogencamp was an officer employed by the New York State Police Department and in doing the acts and things hereafter complained of, he was acting under color of state law and within the scope of said employment and in furtherance of his employer's interests and in his representative capacity as stated. The principal offices of the New York State Police Department are located at Building #22, State Office Campus, 1220 Washington Avenue, Albany, New York 12226-2252.

15.    At all times pertinent to this complaint, the defendant Superintendent Kevin P. Bruen was the Superintendent of the New York State Police Department and employed by the New York State Police Department and in doing the acts and things hereafter complained of, he was acting under color of state law and within the scope of said employment and in furtherance of his employer's interests and in his representative capacity as stated. The principal offices of the New York State Police Department are located at Building #22, State Office Campus, 1220 Washington Avenue, Albany, New York 12226-

2252.

16.    Defendants Chernewsky, Rodriguez, and Hogencamp are each sued in their individual capacity.

17.    Defendant Bruen is sued in his official capacity as the Superintendent of the New York State Police Department.

18.    At all times pertinent to this complaint, all the defendants herein acted under color of the laws, statutes, ordinances, policies, customs, procedures and usages of the New York State Police Department.

19.    Each and every defendant herein was personally involved in each and every violation of Ms. Craddock's clearly established federal constitutional rights.

20.    At all times relevant to this complaint, in doing the acts and things hereinafter complained of, defendants were acting within the scope of their employment as employees of the New York State Police Department, used their authority in furtherance of their employer's interests and was acting in their capacity as a police officer, and said defendants were acting under color of state law.

## STATEMENT OF FACTS

21.    On the morning of July 15, 2021, Ms. Craddock was feeling depressed and in a deeply dark place and was suicidal.

22.    Ms. Craddock felt that she had no chance of regaining custody or obtaining any significant visitation with her children. She felt that she had been unfairly treated by the Columbia County Family Court and had permanently lost her right to see her children.

23.     Ms. Craddock decided to kill herself using an AR-15 type rifle that her boyfriend, Mason Hitchcock, owned which she believed was in the house.

24.     Ms. Craddock searched her home for Mr. Hitchcock's AR-15 but was unable to locate it because he had hidden it, and had also removed the bolt and firing pin from the firearm, which were stored separately where Ms. Craddock could not find them. At 9:32 AM on July 15, 2021 Ms. Craddock text messaged Mason Hitchcock and asked him "Where is the AR[-15]. Please. I need it. It's not up to you this is my life please."

25.     Mr. Hitchcock did not tell Ms. Craddock where the AR-15 was so she continued looking for it in the home she shared with Mr. Hitchcock.

26.     During her search for the AR-15, Ms. Craddock communicated with Brandi Scalise, a coworker and friend of hers, via text messages. Ms. Craddock texted Ms. Scalise "I am trying to kill myself. Sorry." Ms. Scalise responded "I am calling the police" and Ms. Craddock stated "well that's not helpful" and "I have thought about this a lot. For a long time. Just please let me be. I can't do this anymore."

27.     At approximately 10:00 AM on July 15, 2021, the Columbia County 911 dispatch received a phone call from Brandi Scalise who reported that her coworker, Sarah Craddock, was supposed to be at work that day, that Ms. Craddock told her that she was not going to come in. Ms. Scalise reported that Ms. Craddock had threatened suicide and had thought about killing herself for a long time, so Ms. Scalise called 911. Ms. Scalise gave her telephone number to the 911 dispatch officer, and the 911 dispatch officer provided the phone number to State Trooper dispatch.

28.    Ms. Craddock was unable to locate the AR-15 but did locate a Ruger American .22 caliber bolt-action rifle.

29.    The .22 rifle Ms. Craddock found also did not have a bolt or a firing pin installed in it because Mr. Hitchcock had removed them and therefore the rifle was not operable.

30.    There was also no ammunition for the .22 rifle in the house as reflected by an inventory sheet completed by New York State Trooper Investigators.

31.    Ms. Craddock was aware that the .22 rifle was not operable and she continued to search for the AR-15.

32.    At 10:04:04 AM Columbia County 911 dispatched defendant Trooper Nathan Chernewsky, Badge #1K42, to Ms. Craddock's home related to a "report of a suicidal female, a Sarah Craddock, at that location. She is sending text messages to her friends. Unknown further." Trooper Erica Rodriguez, Badge #1K23, also responded to assist at 10:03 AM.

33.    At 10:12:53 AM Trooper dispatch reported that "there has been no other texts since the one stating she wanted to kill herself."

34.    When Trooper Chernewsky began driving to Ms. Craddock's home he had his Trooper vehicle sirens turned on and he was wearing a body camera that was unobstructed and showed a wide field of view at the Trooper's chest level. As Trooper Chernewsky drove to Ms. Craddock's home ███████████████ he pulled his Trooper vehicle into a parking lot along the route, stopped his police vehicle, and exited his vehicle. Upon exiting his vehicle, Trooper Chernewsky went to the trunk and opened the trunk of his vehicle, removed a black

bullet-proof vest, and put the bullet-proof vest on.

35. The bullet-proof vest obscured the vast majority of the view from Trooper Chernewsky's body camera and only a small opening of the camera's lens was not blocked. Trooper Chernewsky re-entered his Trooper vehicle and resumed driving to Ms. Craddocks' home.

36. When Trooper Chernewsky approached Ms. Craddock's home in his marked New York State Trooper Chevrolet Tahoe SUV, he turned off his Trooper vehicle's siren and approached her home in silence.

37. Trooper Chernewsky initially pulled into the driveway leading to Ms. Craddock's home and stopped in the middle of the driveway in front of the house. Trooper Chernewsky then put the vehicle back into drive and moved the vehicle and parked it to the right of and behind a large bush which obscured the Trooper vehicle from view from Ms. Craddock's home. Trooper Chernewsky exited his police vehicle at 10:21:29 AM.

38. When Trooper Chernewsky arrived at Ms. Craddock's residence, he did not announce his presence to Ms. Craddock in any way or knock on any doors. When Trooper Chernewsky first exited his vehicle, he moved down the left side of the vehicle and looked at Ms. Craddock's van parked in the driveway. He then walked toward the front of his Trooper vehicle towards the large bush, went around the front of the vehicle, and on to the right side of it and looked at Ms. Craddock's vehicle and basement door area. He remained in that position behind his Trooper SUV for approximately 30 seconds.

39. At approximately 10:23:00 AM, Trooper Chernewsky walked towards the

rear of Ms. Craddock's house and looked around the back yard. At approximately 10:23:12 AM, he walked left toward the front of the house and then turned to approach the basement door of Ms. Craddock's home and looked into the basement through the windows on the door but did not knock or otherwise announce himself.

40.     Trooper Chernewsky continued walking slowly along the front of the house toward the back side of Ms. Craddock's house opposite where he had parked his Trooper vehicle and approached a set of stairs leading to a raised deck on the back of Ms. Craddock's home.

41.     At approximately 10:23:30 AM Trooper Chernewsky slowly climbed the stairs to the raised deck on the back of Ms. Craddock's home. At the top of the stairs was a raised deck attached to the second floor of the back of the house where Trooper Chernewsky climbed to. On the deck is a window which looks into the kitchen and dining area of Ms. Craddock's house. At approximately 10:23:45 AM, Trooper Chernewsky looked through the window into Ms. Craddock's kitchen and saw Ms. Craddock inside sitting at her kitchen table. The kitchen table was located approximately 14 feet away from Trooper Chernewsky where he was looking through her window.

42.     Ms. Craddock was sitting at the kitchen table, crying with her head down on the kitchen table where she had been drinking beer and where a bottle of beer was visible. She had the inoperable .22 rifle next to her on the table and she was sitting next to a box of Kleenex tissues with a pile of used tissues in front of her. The way Ms. Craddock was sitting at the table, with her head down on the table crying, oriented her so that she could not see

defendant Chernewsky looking in through the window. Ms. Craddock had loud music playing from a stereo in the kitchen and could not hear defendant Chernewsky walking up the stairs or on the deck.

43.    Ms. Craddock had been drinking beer and hard alcohol overnight and into the morning. Blood alcohol concentration tests taken at Albany Medical Center Hospital indicate that approximately 100 minutes after being shot by Trooper Chernewsky, Ms. Craddock had a blood alcohol concentration of 0.203.

44.    The human body processes alcohol at a predictive rate of approximately 0.015 g/100ml/hour which therefore reduces BAC by 0.015 per hour.[1] The BAC test was administered approximately 100 minutes after Ms. Craddock was shot by Trooper Chernewsky and therefore it is possible to accurately estimate her blood alcohol concentration at the time of the shooting as approximately 0.225 (.203 BAC at 12:10 PM plus 0.0225 [0.015 for 60 minutes, 0.0075 for 30 minutes] = a BAC at 10:30 AM of 0.225).

45.    The State Trooper investigative notes provided by the Columbia County District Attorney's Office states that Ms. Craddock's level of intoxication was in the "range known as acute intoxication and can be converted to approximately .223% Blood Alcohol Content."

46.    A BAC of .223, depending on the individual, indicates a person who is severely impaired, disoriented, experiencing a loss of balance, vision issues, they may experience

---

[1] Cowan, J. M.; Weathermon, A.; McCutcheon, J. R.; Oliver, R. D. (1 September 1996). "Determination of Volume of Distribution for Ethanol in Male and Female Subjects". Journal of Analytical Toxicology. 20 (5): 287–290. doi:10.1093/jat/20.5.287. Available at https://academic.oup.com/jat/article/20/5/287/731051?login=false.

emotional instability and a lack of judgment, and may be blacking out and losing memory. It is approximately three times the legal limit of 0.08% for operating a motor vehicle.

47.    Without saying anything or announcing himself or informing Ms. Craddock that he was there to conduct a welfare check, Trooper Chernewsky quietly walked down the stairs of the back deck and then jogged to the passenger side of his police car. In total, Trooper Chernewsky spent approximately three minutes on Ms. Craddock's property without announcing his presence, without attempting to contact Ms. Craddock, and without attempting to inform Ms. Craddock that he was there to conduct a welfare check.

48.    At 10:24:20 AM Trooper Chernewsky called to dispatch and stated that "I've got a female subject with a long gun." Trooper Chernewsky then went to the trunk of his Trooper vehicle and withdrew a Remington 870 shotgun. The Remington 870 shotgun was loaded with 70mm rifled slug shotgun rounds. Trooper Chernewsky racked the shotgun to load a round into the firing chamber of the weapon. At 10:25:13 AM Trooper Chernewsky stated to dispatch that "She's inside, in the kitchen. She doesn't know I'm here I saw her through a window."

49.    At 10:25:30 AM, Trooper Rodriguez arrived at Ms. Craddock's home and was the second officer on the scene. She parked her Trooper vehicle at the bottom of Ms. Craddock's driveway, approximately 60 feet from Ms. Craddock's home, with her State Trooper police car straddling the shoulder of Route 22 and the Ms. Craddock's driveway. Trooper Rodriguez exited her Trooper vehicle and proceeded to the rear of the vehicle, behind the car with the trunk fully door raised obscuring her view of Ms. Craddock's home.

Trooper Rodriguez remained behind her police car with the trunk door open from the point that she arrived on the scene and exited her vehicle until Ms. Craddock was shot by Trooper Chernewsky.

50.    Trooper Chernewsky and Trooper Rodriguez discussed the situation with each other from a distance while standing approximately 50 to 60 feet apart, and also communicated with Trooper dispatch. During the following quoted conversation, the two Troopers are outside the home, on Ms. Craddock's property in front of the home in the driveway area. Trooper Rodriguez was behind the trunk of her Trooper vehicle, with the trunk door open. Trooper Rodriguez's car was parked in the beginning portion of Ms. Craddock's driveway, with the rear of her car partially on the paved shoulder of US Route 22. Trooper Rodriguez was standing very close to passing traffic on Route 22 and cars are shown on her body camera as they pass behind her. Trooper Chernewsky is standing on the right side of his Trooper SUV, on the far side away and opposite from Ms. Craddock's home, so that his vehicle was between him and Ms. Craddock's home. Trooper Chernewsky's SUV is parked behind a large bush/shrub between the vehicle and the basement door of Ms. Craddock's home. The vehicle traffic on Route 22 is loud, so Trooper Rodriguez and Trooper Chernewsky were yelling back and forth to one another. The following conversation took place with the officers shouting back and forth from their positions:

10:25:42 – Chernewsky: "Backside door."
10:26:04 – Rodriguez: "Backside door?"
10:26:06 – Chernewsky:  "Go up to the back steps she's in the kitchen."
10:26:08 – Rodriguez: "You talk to her?"
10:26:10 – Chernewsky: "I just saw her and took off."

**10:26:12 – Rodriguez: "Alright."**

**10:26:45 – Dispatch: "Locate 4/2 can you switch over to state."**

**10:27:05 – Dispatch: "Did you see to locate 4/2. You said she's in an upstairs window, or downstairs?"**

**10:27:11 – Chernewsky: "Head down on the kitchen table. She is not injured at this time."**

**10:27:26 – Dispatch: "Copy. She's got her head down on the table, can you see the weapon."**

**10:27:34 - Chernewsky: "Affirmative. I've got a long gun on the kitchen table where she's sitting."**

**10:27:40 – Dispatch: "You said it was the first or second floor. Is it an apartment or a house?"**

**10:27:46 – Chernewsky: "Two story, single family home. She's on the second story back side."**

**10:27:59 – Rodriguez: "I can't see her."**

**10:28:05 – Rodriguez: "Is this an apartment?" (Yelling) "I can't hear you."**

**10:28:17 – Rodriguez (yelling): "I can't hear you ma'am."**

**10:28:24 – Rodriguez (yelling): "I can't hear you, you're going to have to be a little louder."**

**10:28:30 – Rodriguez: "I can't hear her. Is she blonde? Is this an apartment Nate [Chernewsky]?"**

**10:28:33 – Chernewsky: "I think it's a house, the basement is just, it's a basement."**

**10:28:26 – Dispatch: "ok 5/0 [unintelligible] on the way, and hostage negotiators have been contacted."**

**10:28:37 – Rodriguez: "She's downstairs? Upstairs. So female upstairs. Yeah, she's in the window."**

**10:28:42 – Rodriguez (yelling): "What are you saying?"**

**10:28:53 – Dispatch: "To 5/0 [unintelligible] has been advised, hostage negotiators were getting in touch with PD."**

**10:29:20 – Rodriguez: "Nate, she's upstairs?"**

**10:29:21 - Chernewsky: "Upstairs, the back porch."**

**10:29:23 – Rodriguez: "Red shirt, blonde hair? She's in the window."**

**10:29:28 – Chernewsky: "Upstairs window?"**

**10:29:30 – Rodriguez: "Now the dog, yeah hold on."**

**10:29:34 – Rodriguez (to dispatch): "One K 2/3 Poughkeepsie be advised female blonde hair upstairs window."**

**10:29:49 – Dispatch: "Copy we are shutting 22 [crosstalk]."**

**10:29:51 – Chernewsky: "I'm on repeater for troop." (Chernewsky Axon Body Camera, 2021-07-15-1005_X60A0532G, 10:25:30–10:29; Rodriguez Axon Body Camera, 2021-07-15-1006_X60A0789D, 10:25:30 – 10:29).**

51. At no point during this conversation did Trooper Chernewksy try to determine where or how far away hostage negotiators were, if they were already on their way, or what their expected time of arrival was or would be.

52. During this time Ms. Craddock's dog was barking, and she thought that her boyfriend, Mason Hitchcock, had come home. Mr. Hitchcock often came home during the day when he was working to use the bathroom or eat lunch and typically parked where Trooper Chernewsky had parked his police vehicle.

53. Ms. Craddock cracked open her basement door to see if Mr. Hitchcock was home, but could not see anything in her driveway other than the large green bush so she shut the door and went back into the basement.

54. Ms. Craddock resumed looking for the bolt and firing pin for the .22 rifle so that she could use it to shoot herself.

55. Ms. Craddock's dog continued to bark so Ms. Craddock went back to the basement door, opened the door, and stepped onto the concrete landing immediately outside the basement door.

56. At 10:30:00 AM Ms. Craddock exited the basement door she was standing on a small concrete landing outside of the door. Ms. Craddock was holding the .22 rifle in her right hand grasping the top of the barrel of the rifle, with her arm down at her side, so that the rifle was at her right side near her hip and the barrel was pointed at the ground

57. When Ms. Craddock exited the basement door, she was not pointing the .22 rifle at anyone.

58.    When Ms. Craddock exited the basement door Trooper Chernewsky was on the passenger side of his State Trooper vehicle, near the "A-pillar" which is the angled pillar that connects the bottom of the windshield frame with the roof, on the opposite side of the vehicle to Ms. Craddock's home.

59.    Trooper Chernewsky's Trooper vehicle was parked behind a very large bush which blocked the view from the basement door of Ms. Craddock's home of Trooper Chernewsky and his vehicle, and Trooper Chernewsky stationed himself behind the cover of his State Trooper vehicle.

60.    Trooper Chernewsky was standing on the passenger side of his police vehicle, on the side of his vehicle away from Ms. Craddock's home, so the vehicle was between him and the door to the basement. He was standing near the front windshield of his police vehicle, looking over the hood or roof of his police vehicle toward the house. His line of sight was interrupted by the large green bush located in the front yard of Ms. Craddock's home and he did not "have a good picture of Ms. Craddock."

61.    When Ms. Craddock exited the basement door Trooper Rodriguez crouched down behind the trunk and bumper of her State Trooper vehicle.

62.    Ms. Craddock did not see the State Troopers when she exited the door from her basement.

63.    Ms. Craddock does not remember seeing the State Troopers before she exited her basement door or when she exited the basement door as a result of the injuries she received from being shot by Trooper Chernewsky. In viewing the body-camera videos during

the criminal court proceedings against her, Ms. Craddock realizes that when she exited the basement door, she must have known the Troopers were present on her property.

64. From the time when Ms. Craddock exited her basement door at 10:30:00 AM until the time she was shot, neither Trooper Chernewsky or Trooper Rodriguez identified themselves as police officers, and the Troopers did not attempt to inform Ms. Craddock that they were there doing a welfare check and that they were there to make sure she did not harm herself.

65. Trooper Chernewsky yelled "gun gun gun" and yelled to Ms. Craddock to "put the gun down."

66. Trooper Rodriguez, who is still behind the trunk of her car, yelled "drop it."

67. Ms. Craddock does not remember being aware of who was yelling at her, was intoxicated, did not know what was going on, and again yelled at the people who are shouting at her to "Get the fuck off my property" and to "Get off my property."

68. Trooper Rodriguez responded, saying "Ma'am, please drop it."

69. Trooper Chernewsky yelled "I'm not going to shoot you."

70. After Trooper Chernewsky yelled that he was not going to shoot Ms. Craddock, Ms. Craddock turned to go back into her basement.

71. When Ms. Craddock turned to go back into the basement at approximately 10:31:57 AM, she was facing her basement door with the right side of her back facing toward Trooper Chernewsky.

72. Approximately one second after Ms. Craddock turned to enter her basement

door, at 10:31:59 AM, Trooper Chernewsky fired his 12-gauge shotgun at Ms. Craddock, striking her in the right lower quadrant of her back with the 12-gauge 70mm lead slug.

73.     The 12-gauge 70mm rifled slug struck Ms. Craddock in her right lower back and caused a complete evisceration of Ms. Craddock, and she fell down on the concrete landing just outside her basement doo with her intestines and what remained of her stomach and abdominal wall spewed outside the front of her body

74.     The shooting of Ms. Craddock by Trooper Chernewsky is not visible on the video footage of his body camera because the Axon Body Camera is obscured by his bullet proof vest.

75.     The shooting of Ms. Craddock by Trooper Chernewsky is not visible on the video footage of Trooper Roriguez' body camera because the Axon Body Camera is obscured by her bullet proof vest and she was standing behind the open trunk of her car.

76.     During the approximate two-minute timeframe from the point that Ms. Craddock exited the basement door at 10:30:00 AM to the point that Trooper Chernewsky shot her at 10:31:59 AM neither Chernewsky or Rodriguez informed Ms. Craddock that they were New York State Troopers dispatched to her house to perform a welfare check and to check on her safety.

77.     Approximately 12 seconds after Trooper Chernewsky shot Ms. Craddock and while Ms. Craddock was lying eviscerated on the landing to her basement, Trooper Rodriguez yelled from behind her car to "drop it" indicating that she was unable to see where Ms. Craddock was.

78.    Trooper Chernewsky informed dispatch "4/2 to Poughkeepsie subject is down, subject is down. Patrols remain behind cover."

79.    Trooper Chernewsky then yelled to Trooper Rodriguez "Can you see if she's moving?" Trooper Chernewsky asked Trooper Rodriguez "if [Ms. Craddock was] moving."

80.    At approximately 10:33:43 AM a third officer, Trooper Louis E. Godfroy, arrived on scene. Trooper Godfroy asked Trooper Rodriguez who shot Ms. Craddock, and Trooper Rodriguez stated "Nate did," meaning Trooper Nathan Chernewsky.

81.    Trooper Rodriguez slowly approached Ms. Craddock to render aid. When Trooper Rodriguez approached Ms. Craddock, Ms. Craddock was lying on the landing outside the front of her basement door, on her right side, in the fetal position. The .22 rifle is underneath Ms. Craddock's hip and lower abdomen.

82.    Trooper Rodriguez cleared the .22 rifle from underneath Ms. Craddock's hip and rendered life-saving aid to Ms. Craddock. Trooper Rodriguez put Ms. Craddock's intestines back into her body cavity, and using trauma pads and towels put pressure to minimize bleeding. Ms. Craddock remained on the ground as Trooper Rodriguez and another State Trooper attempted to provide medical services until EMS arrived at approximately 10:54:25 AM while Trooper Chernewsky cleared the basement of the residence.

83.    Trooper Chernewsky retrieved trauma pads from his police vehicle which he provided to Trooper Rodriguez but otherwise did not render aid to Ms. Craddock after shooting Ms. Craddock and instead stood by her feet and, after several minutes, sat in the

grass approximately 15 feet away from her. Other Troopers brought Trooper Chernewsky water as he sat in the grass.

84.    When other officers arrived on scene, two officers helped Trooper Chernewsky get up off the grass and he was instructed to sit in his police vehicle so that he could sit in the truck with the air conditioner running. A Trooper in dress uniform spoke to Chernewsky and turned off his body-camera video.

85.    While Trooper Chernewsky sat in his vehicle, Trooper Rodriguez continued to provide life-saving care to Ms. Craddock, refusing to swap out her place with other Troopers who offered to provide assistance, continually talking to Ms. Craddock to keep her conscious, and continued to hold a trauma pad over her eviscerated stomach to keep her internal organs in her body cavity.

86.    Trooper Rodriguez saved Ms. Craddock's life by using trauma pads or towels and applying pressure to her abdomen to keep her organs in her body cavity. Trooper Rodriguez held Ms. Craddock's viscera inside her and applied pressure with her hands, towels, and trauma pads and kept Ms. Craddock awake and talking for approximately twenty-two minutes until EMS arrived at approximately 10:53 AM. Ms. Craddock was transported from the scene by EMS services to the New Lebanon High School, and then airlifted to Albany Medical Center Hospital.

87.    The New York State Troopers began an almost immediate attempt to cover-up and shift blame onto Ms. Craddock by claiming that she had shot herself with a shotgun in a suicide attempt.

88.     Much of the paperwork drafted by the investigating New York State Troopers and other Troopers who responded to the shooting on July 15, 2021 represent that Ms. Craddock shot herself in the stomach with a shotgun.

89.     During the search of Ms. Craddock's home by Deputy Sheriffs and State Troopers after she was shot a Deputy Sheriff can be heard saying that he was "trying to figure out where [in the house] she shot herself."

90.     New York State Troopers told family and friends of Ms. Craddock that she had shot herself. Maxwell Shackett, Ms. Craddock's father, was informed that his daughter "had shot herself with a shotgun." Later, Mr. Shackett was told by a paramedic that his daughter had suffered a "self-inflicted shotgun wound to the abdomen." A State Trooper Investigator later told Mr. Shackett that his daughter had died in the helicopter on the way to Albany Medical Center Hospital.

91.     A New York State Trooper Investigator told Mason Hitchcock, Ms. Craddock's boyfriend whom she lived with, that Ms. Craddock had been "pronounced dead for a self-inflicted gunshot wound" and had died in the ambulance before she got to the medevac helicopter. Mr. Hitchcock was transported to the New Lebanon State Trooper barracks where he gave a statement for approximately two hours before he was informed that Ms. Craddock was still alive.

92.     A statement by Esperanza Sanchez, a paramedic with the Chatham Rescue Squad, states that she was dispatched for a "self-inflicted gunshot wound to abdomen." A similar statement by an EMT, Jacob Seabury, also from Chatham Rescue Squad but in a

different ambulance unit, was dispatched for a "self-inflicted gun shot wound … to the abdomen."

93.    Much of the early medical records from Albany Medical Center Hospital refer to Ms. Craddock's injuries as a self-inflicted gunshot wound.

94.    On July 16, 2021, defendant Hogencamp wrote and submitted two felony complaints to be filed to the Town of New Lebanon Local Criminal Court which charged Ms. Craddock with criminal possession of a weapon in the third degree in violation of Penal Law 265.02 and menacing a police officer in violation of Penal Law 120.18.

95.    On August 10, 2023, Hon. Richard M. Koweek, Columbia County Court Judge, dismissed the charges against Ms. Craddock on the basis that the prosecution had failed to be ready for trial against Ms. Craddock within 180 days in violation of her constitutional right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution.

## FIRST CLAIM

96.    The allegations contained in paragraphs 1 through 95 are hereby repeated and re-alleged as if fully set forth herein.

97.    Ms. Craddock's first claim is against defendant Chernewsky for violation of her clearly established federal constitutional rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

98.    Defendant Chernewsky did not act like a reasonable police officer and used

excessive force against Ms. Craddock when he:

(a) Failed to attempt to initiate any contact or call Ms. Craddock; and

(b) Failed to attempt to contact Brandi Scalise; and

(c) Failed to attempt to contact Ms. Craddock's family members, who lived in the immediate vicinity; and

(d) Set up a defensive perimeter around Ms. Craddock's home and acted like a SWAT team instead of making contact and conducting a welfare check on Ms. Craddock; and

(e) Failed to inquire and find out when hostage negotiators would arrive on scene; and

(f) Did not wait for hostage negotiators to arrive on scene before attempting to make contact with Ms. Craddock; and

(g) Failed to announce that he was a police officer; and

(h) Failed to inform Ms. Craddock that he was there to conduct a welfare check on her; and

(i) Failed to inform Ms. Craddock that he was going to use lethal force on her if she did not comply; and

(j) Fired his shotgun at Ms. Craddock from a place of sheltered cover behind his State Trooper police car when Ms. Craddock was not using deadly force; and

(k) Fired his shotgun at Ms. Craddock when she could not see him behind the bush or behind his State Trooper vehicle; and

(l) Shot Ms. Craddock when she did not represent a threat of deadly force to defendant

Chernewsky or others; and

(m) Shot Ms. Craddock in the back when he did not have probable cause to believe that Ms. Craddock posed a significant threat of death or serious physical injury to himself, other officers, or any other persons.

99.    When defendant Chernewsky first arrived at Ms. Craddock's home he was alone and without any back up.

100.    Defendant Chernewsky snuck around the exterior of Ms. Craddock's home looking for her by himself without announcing his presence or making any attempt to make contact with Ms. Craddock.

101.    Once defendant Chernewsky determined that Ms. Craddock was alive and was in possession of a rifle, he returned to his Trooper vehicle to retrieve a shotgun, loading it with 70mm rifled slug ammunition, a deadly round historically designed for killing large game.

102.    Defendant Chernewsky then took a defensive position behind the "A-pillar" of his Trooper vehicle which was parked behind a large bush obscuring him and his Trooper vehicle from view of Ms. Craddock's home and stood behind the side of his Trooper vehicle.

103.    Defendant Chernewsky did not attempt to call Ms. Craddock, whose cell phone was on the kitchen table where defendant Chernewsky saw her sitting.

104.    Defendant Chernewsky did not attempt call Brandi Scalise who had reported that Ms. Craddock was suicidal to 911 operators and had provided her telephone number to 911 operators who forwarded that information to State Trooper dispatch and defendant

Chernewsky.

105.    Defendant Chernewsky did not attempt to call any family members of Ms. Craddock.

106.    A reasonable police officer who was responding to a call of a reported suicidal person and dispatched for a welfare check would have made an effort to contact that individual or contact family and friends to determine their wellbeing.

107.    Defendant Chernewsky's failure to attempt to contact Ms. Craddock to determine her wellbeing was not reasonable given that he was dispatched to conduct a welfare check about her safety.

108.    After seeing Ms. Craddock in her kitchen, and without contacting her, defendant Chernewsky took up a defensive position on the passenger side of his police vehicle, on the side of his vehicle away from Ms. Craddock's home, so the vehicle was between him and the door to the basement. He was standing near the front windshield of his police vehicle, looking over the hood or roof of his police vehicle toward the house. His line of sight was obscured by a large green bush located in the front yard of Ms. Craddock's home and he did not have an unobstructed view of Ms. Craddock. Defendant Chernewsky described it as he "didn't have a good picture of Ms. Craddock" and Ms. Craddock "couldn't see" Chernewsky.

109.    While defendant Chernewsky was in a defensive position holding his shotgun, Trooper dispatch informed him that hostage negotiators had been contacted.

110.    Defendant Chernewsky did not try to determine where or how far away

hostage negotiators were, if they were already on their way, or what their expected time of arrival was or would be.

111.    Defendant Chernewsky should have waited for hostage negotiators or members of an emergency services unit or other similar unit who was prepared to respond to individuals who are emotionally unstable and/or suicidal and/or disturbed and not taken action until these individuals arrived at Ms. Craddock's home.

112.    A reasonable police officer who was not trained in responding to emotionally unstable and/or suicidal and/or disturbed individuals would have tried to determine when officers more experienced in dealing with mentally unstable persons would be arriving on the scene before taking a course of action.

113.    Defendant Chernewsky's actions were unreasonable given his lack of training and experience in responding to emotionally unstable and/or suicidal and/or disturbed people.

114.    When Ms. Craddock exited the basement door of her home holding an unloaded and inoperable .22 rifle defendant Chernewsky shouted "gun, gun, gun" but did not identify himself as a police officer.

115.    Ms. Craddock was holding the inoperable .22 rifle because she had been searching for the bolt, firing pin, and ammunition for the rifle so that she could use the rifle to kill herself.

116.    Ms. Craddock intended to use the inoperable .22 rifle to kill herself, she had no intention of using the .22 rifle against the State Troopers who responded to make the

welfare check.

117.    Ms. Craddock's possession of the inoperable .22 rifle was related solely to her desire to kill herself with that weapon, but she was unable to because she could not find the firing pin, firing bolt, or any .22 rifle ammunition.

118.    Ms. Craddock was holding the inoperable .22 rifle down to her right in her right hand and engaged in back and forth screaming conversation with the defendants for approximately two minutes demanding that they get off of her property.

119.    From the time when Ms. Craddock exited her basement door until the time she was shot, defendant Chernewsky did not identify himself as a police officer and he did not attempt to inform Ms. Craddock that he was on her property to conduct a welfare check and that he was there to make sure she did not harm herself.

120.    During the approximate two-minute timeframe from the point that Ms. Craddock exited the basement door to the point that defendant Chernewsky shot her, defendant Chernewsky failed to inform Ms. Craddock that he was at her house to perform a welfare check and to check on her safety.

121.    A reasonable police officer would inform an individual that they were police officers who were there to conduct a welfare check and were only there to ensure the safety of Ms. Craddock.

122.    Defendant Chernewsky's conduct of failing to inform Ms. Craddock he was a police officer who was dispatched to conduct a welfare check was unreasonable.

123.    Defendant Chernewsky did not warn or otherwise advise Ms. Craddock that

he would shoot her if she failed to comply with his orders.

124.    Defendant Chernewsky provided unclear instructions to Ms. Craddock and Ms. Craddock did not understand how to comply.

125.    Approximately one second before defendant Chernewsky shot Ms. Craddock he told her "I'm not going to shoot you."

126.    Ms. Craddock turned to go back into her basement resulting in her back being exposed to defendant Chernewsky so she could go back through the door to her basement.

127.    When Ms. Craddock turned her back to defendant Chernewsky he fired his shotgun.

128.    When defendant Chernewsky fired his shotgun, he was far from Ms. Craddock at a distance of approximately 40 feet.

129.    When defendant Chernewsky fired his shotgun, Ms. Craddock could not see defendant Chernewsky who was behind his Trooper vehicle which was parked behind a large green bush.

130.    When defendant Chernewsky fired his shotgun, he fired at Ms. Craddock from a well-sheltered place of safety behind the cover of his Trooper vehicle and with his entire body behind the Trooper vehicle and only his head was exposed.

131.    When defendant Chernewsky fired his shotgun, he did not warn Ms. Craddock that he was going to shoot her.

132.    Defendant Chernewsky had time, opportunity, and the means to inform Ms. Craddock that he would use deadly force.

133.    A reasonable police officer would inform a person that he was going to use deadly force prior to employing that deadly force.

134.    Defendant Chernewsky acted unreasonably when he fired his shotgun at Ms. Craddock without warning her that he was going to use deadly force.

135.    When defendant Chernewsky fired his shotgun and struck Ms. Craddock, he had fired from a position where he was obscured behind a large shrub and was not visible to Ms. Craddock who could not see what was behind the shrub.

136.    A reasonable police officer would not fire from a placet in which he was obscured behind the large overgrowth of a large shrub and without knowing what was behind the individual he was shooting at.

137.    Defendant Chernewsky acted unreasonably when he fired his shotgun at Ms. Craddock from behind his Trooper vehicle parked behind a large shrub preventing him from seeing what was behind his target and his target from seeing him.

138.    Trooper Chernewsky shot Ms. Craddock with his shotgun in a situation where it was certain that Ms. Craddock would suffer serious physical injury or death and where there was no threat of serious physical injury or death to himself or others.

139.    It was foreseeable that Trooper Chernewsky firing his shotgun at Ms. Craddock with a large lead slug would cause serious injury or death.

140.    The 70mm rifled slug fired by defendant Chernewsky struck Ms. Craddock in the right side of her lower back and fragments exited toward the middle of Ms. Craddock's stomach, resulting in evisceration.

141.    As a result of being struck by the 70mm rifled slug, Ms. Craddock's intestines and/or stomach were blown out through the front of her stomach and green stomach fluid poured over her calves and feet as she collapsed on the concrete landing in front of the door to her basement.

142.    The trajectory of the gunshot, entering her right lower back and exiting in the front from her stomach, contradicts defendant Chernewsky's claim that Ms. Craddock was facing him when he fired his shotgun.

143.    Defendant Chernewsky lied about Ms. Craddock allegedly running at him with her rifle aimed and pointed at him in order to justify his shooting of Ms. Craddock.

144.    When Ms. Craddock was turned to go back into the basement door and Trooper Chernewsky shot her, she posed no immediate threat to defendant Chernewsky and/or defendant Rodriguez or any other person.

145.    A reasonable police officer would not shoot an individual, who was not posing an immediate serious danger to the officer or others, in the back as they entered their home.

146.    Defendant Chernewsky acted unreasonably when he fired his shotgun at Ms. Craddock.

147.    The force used by defendant Chernewsky exceeded the force needed given the factual circumstances and situation and was unreasonable.

148.    Trooper Chernewsky fired his police issued shotgun without warning Ms. Craddock that he would shoot her when Ms. Craddock was posing no threat to defendant Chernewsky.

149.    The series of unreasonable actions taken by both defendant Chernewsky and defendant Rodriguez created a scenario where the only possible outcome was Ms. Craddock being shot by one, or both, of the officers.

150.    Defendant Chernewsky's use of the shotgun to shoot Ms. Craddock with a 70mm shotgun round was unreasonable and unnecessary because Ms. Craddock was not posing an immediate threat to either Trooper, plaintiff was turned away from Trooper Chernewsky and Trooper Rodriguez and walking back into the basement, plaintiff was surrounded by two State Troopers with many others responding and had no place to flee, and plaintiff would suffer serious injury or death if she was shot by a shotgun.

151.    When Ms. Craddock had turned to go back into the basement door of her home, no reasonably competent officer would have concluded that the use of deadly force in that moment was reasonable or necessary.

152.    Defendant Chernewsky did not have probable cause to believe that Ms. Craddock posed a significant threat of death or serious physical injury to himself, to Trooper Rodriguez, to other officers, or to anyone when she turned her back to him to go back into her basement through the open basement door.

153.    Defendant Chernewsky's use of deadly force to apprehend Ms. Craddock or prevent her from going back into her home was not objectively reasonable, and a reasonably prudent officer in similar circumstances and in light of the facts and situation confronting that reasonably prudent officer would not have shot Ms. Craddock at that time.

154.    Defendant Chernewsky's use of force was objectively unreasonable.

155.    Defendant Chernewsky's use of force exceeded what was needed for him to conduct a welfare check.

156.    Defendant Chernewsky's use of force exceeded what was reasonable to protect himself and Trooper Rodriguez.

157.    Defendant Chernewsky's use of a shotgun firing a 70mm lead slug which struck Ms. Craddock in her back causing a complete evisceration violated Ms. Craddock's constitutional right under the Fourth and Fourteenth Amendments to be free from excessive force.

158.    As a direct, legal and proximate result of the defendant Chernewsky's unconstitutional acts, plaintiff Craddock was seriously injured; plaintiff suffered extensive physical injuries and was eviscerated; plaintiff required multiple surgeries and a lengthy hospitalization; plaintiff suffered pain and suffering; plaintiff suffers ongoing physical pain; plaintiff suffers constant pain from metal fragments from the 70mm rifled slug that can not be removed; plaintiff suffered mental anguish and stress; plaintiff has permanent physical injuries and pain; plaintiff has other injuries and pain; plaintiff is disabled; and plaintiff endured violations of her Fourth and Fourteenth Amendment rights.

WHEREFORE, plaintiff demands judgment against the defendant Chernewsky individually and jointly and prays for relief as follows:

(a)    That she be compensated for violation of her constitutional rights, pain, suffering, and humiliation in the amount of $10,000,000; and

(b)    That she be awarded punitive damages against the defendant Trooper

Chernewsky in the amount of $10,000,000; and

(c)     That she be compensated for the costs and disbursements of this action; and

(d)     That she be compensated for attorney's fees; and

(e)     For such other and further relief as the Court may deem just and proper.

## <u>SECOND CLAIM</u>

159.    The allegations contained in paragraphs 1 through 158 are hereby repeated and re-alleged as if fully set forth herein.

160.    Ms. Craddock's second claim is against New York State Trooper Erica Rodriguez for deprivation of Ms. Craddock's right to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution as a result of her failure to intervene and prevent the use of excessive force by defendant Chernewsky.

161.    When defendant Rodriguez arrived on the scene at Ms. Craddock's home, defendant Chernewsky was already set up under cover in a defensive position behind his Trooper vehicle and holding the Remington 870 shotgun and pointing it at Ms. Craddock's home.

162.    Defendant Rodriguez had notice, and had reason to believe, that defendant Chernewsky intended to use excessive force against Ms. Craddock when he pointed his Remington 870 shotgun at Ms. Craddock.

163.    Defendant Rodriguez knew, and had reason to believe, that defendant

Chernewsky would not have pointed his Remington 870 shotgun at Ms. Craddock if he did not expect to use it against Ms. Craddock.

164.    As soon as she arrived on the scene, defendant Rodriguez was able to freely communicate with defendant Chernewsky, and while they were present on Ms. Craddock's property the two defendants had a conversation from approximately 10:25:30 am until 10:29:59 am.

165.    During this 4 ½ minute long conversation defendant Rodriguez had a realistic opportunity to intervene and prevent the harm from occurring to Ms. Craddock.

166.    During this 4 ½ minute long conversation between the two defendants, both defendants received notice that hostage negotiators had been contacted.

167.    Defendant Rodriguez should have spoken defendant Chernewsky and instructed him that the two of them should wait until hostage negotiators arrived on the scene before confronting Craddock.

168.    Had defendant Rodriguez instructed or otherwise suggested to defendant Chernewsky that they wait for hostage negotiators to arrive, she would have prevented Ms. Craddock from being shot by defendant Chernewsky.

169.    Instead of telling defendant Chernewsky to wait before confronting Ms. Craddock for hostage negotiators to arrive, defendant Rodriguez took cover behind her Trooper vehicle, armed herself with a shotgun, loaded the shotgun, and set up a defensive perimeter around Ms. Craddock's home.

170.    Defendant Rodriguez's actions in failing to instruct defendant Chernewsky to

wait for the hostage negotiators to arrive was intentional conduct that allowed defendant Chernewsky to exercise excessive force against Ms. Craddock.

171.    While set up in a defense position, defendant Rodriguez began to yell to Ms. Craddock while she was in her upstairs kitchen that she could not hear Ms. Craddock and that Ms. Craddock would have to be louder.

172.    When defendant Rodriguez ordered Ms. Craddock to obey her commands and was yelling to her while Ms. Craddock was inside her house, defendant Rodriguez knew that Ms. Craddock was alive and not injured and they exceeded their authority for a welfare check when they failed to wait for hostage negotiators.

173.    Defendant Rodriguez's conduct in yelling at Ms. Craddock caused Ms. Craddock's dog to bark in a loud and unusual way, which resulted in Ms. Craddock stepping outside her basement door and Chernewsky using excessive force on Ms. Craddock by firing his Remington 870 shotgun at her.

174.    When Ms. Craddock exited the basement door of her home carrying an unloaded and inoperable .22 rifle defendant Rodriguez shouted "whoa, whoa, whoa" and "Drop it" but did not identify herself as a police officer.

175.    During the approximate two-minute timeframe from the point that Ms. Craddock exited the basement door to the point that defendant Chernewsky shot her, defendant Rodriguez's action in failing to instruct defendant Chernewsky to wait for the hostage negotiators to arrive was intentional conduct that allowed defendant Chernewsky to exercise excessive force against Ms. Craddock.

176.    During the approximate two-minute timeframe from the point that Ms. Craddock exited the basement door to the point that defendant Chernewsky shot her, defendant Rodriguez failed to inform Ms. Craddock that she was a police officer.

177.    During the approximate two-minute timeframe from the point that Ms. Craddock exited the basement door to the point that defendant Chernewsky shot her, defendant Rodriguez failed to inform Ms. Craddock that she was at her house to perform a welfare check and to check on her safety.

178.    A reasonable police officer would inform an individual that they were police officers who were there to conduct a welfare check and were there only to ensure the safety of Ms. Craddock.

179.    Defendant Rodriguez's conduct of failing to identify they were police officers dispatched to conduct a welfare check on Ms. Craddock was unreasonable and was an intentional conduct by defendant Rodriguez that allowed defendant Chernewsky to exercise excessive force against Ms. Craddock.

180.    During the New York State Trooper's investigation of the shooting of Ms. Craddock, Trooper Investigator's conducted an interrogation of both defendant Chernewsky and defendant Rodriguez.

181.    During defendant Rodriguez's interrogation she was asked "Please describe in detail what exactly Ms. Craddock was doing when Trooper Chernewsky fired [his shotgun at Ms. Craddock]?" Defendant Rodriguez stated that Ms. Craddock "had exited the house. Pointed the gun at him. It was now shouldered at this time. And walked straight towards

him and said, shoot me, shoot me."

182.    Ms. Craddock did not walk toward defendant Chernewsky and did step foot off the concrete landing outside her basement door. When Ms. Craddock said "shoot me, shoot me," Trooper Chernewsky responded with "I'm not going to shoot you." Ms. Craddock then turned to go back into the basement door and approximately one second later defendant Chernewsky shot Ms. Craddock in the back.

183.    After defendant Chernewsky shot Ms. Craddock with his shotgun she collapsed onto the landing immediately outside the basement door where she had remained the entire time, with her intestines eviscerated on the landing.

184.    Defendant Rodriguez fabricated her testimony during her interrogation that Ms. Craddock "walked straight towards him" with the inoperable rifle "shouldered" in order to cover up the use of excessive force that she had failed to prevent.

185.    As a direct, legal and proximate result of defendant Rodriguez's unconstitutional acts, plaintiff Craddock was seriously injured; plaintiff suffered extensive physical injuries and was eviscerated; plaintiff required multiple surgeries and a lengthy hospitalization; plaintiff suffered pain and suffering; plaintiff suffers ongoing physical pain; plaintiff suffers constant pain from metal fragments from the 70mm rifled slug that can not be removed; plaintiff suffered mental anguish and stress; plaintiff has permanent physical injuries and pain; plaintiff has other injuries and pain; plaintiff is disabled; and plaintiff endured violations of her Fourth and Fourteenth Amendment rights.

WHEREFORE, plaintiff demands judgment against defendant Rodriguez

individually and jointly and prays for relief as follows:

    (a)    That she be compensated for violation of her constitutional rights, pain, suffering, and humiliation in the amount of $5,000,000; and

    (b)    That she be compensated for the costs and disbursements of this action; and

    (c)    That she be compensated for attorney's fees; and

    (d)    For such other and further relief as the Court may deem just and proper.

### THIRD CLAIM

186.    The allegations contained in paragraphs 1 through 185 are hereby repeated and re-alleged as if fully set forth herein.

187.    Plaintiffs' third claim is against defendants Chernewsky and Rodriguez for violation of plaintiffs' clearly established rights to be free from illegal seizer or detention under the Fourth and Fourteenth Amendments to the United States Constitution.

188.    On July 15, 2021, defendants Chernewsky and Rodriguez, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so and while responding to a welfare check, arrested Ms. Craddock and deprived plaintiff of her freedom of movement and clearly established rights to be free from illegal seizure or detention under the Fourth and Fourteenth Amendments to the United States Constitution.

189.    Ms. Craddock was illegally detained when defendants Chernewsky and Rodriguez pointed Remington 870 shotguns at her while she was standing at the basement

door of her home and ordered her to obey their commands.

190. On July 15, 2021, when they pointed their shotguns at Ms. Craddock and ordered her to obey their commands, defendants Chernewsky and Rodriguez did not have an arrest warrant or search warrant for the arrest of Ms. Craddock or for a search of her home or property.

191. On July 15, 2021 when they pointed their shotguns at Ms. Craddock and ordered her to obey their commands, defendants Chernewsky and Rodriguez did not have probable cause to arrest Ms. Craddock because Ms. Craddock had not engaged in any criminal conduct.

192. When they pointed their shotguns at her and ordered her to obey their commands, defendants Chernewsky and Rodriguez knew that Ms. Craddock was alive and not injured, defendant Chernewsky reported to dispatch that "she [Craddock] is not injured at this time," and the defendants exceeded their authority for a welfare check.

193. Defendants Chernewsky and Rodriguez exceeded their authority to conduct a welfare check by arresting Ms. Craddock on July 15, 2021 without probable cause that she had committed a violation of New York law.

194. In arresting Ms. Craddock on July 15, 2021 and thereafter, her freedom of movement was impeded, and defendants Chernewsky and Rodriguez intended to confine her.

195. Ms. Craddock was seized and confined and her freedom of movement was curtailed by defendants Chernewsky and Rodriguez.

196.    Ms. Craddock was detained and confined by law enforcement officers in an ambulance, in a helicopter, and at the Albany Medical Center Hospital under New York State Police guard for thirteen (13) days from July 15, 2021 to July 28, 2021.

197.    Ms. Craddock was discharged from Albany Medical Center Hospital and transported to Columbia County Jail where she was confined for an additional four (4) days from August 3, 2021 to August 6, 2021.

198.    When defendants Chernewsky and Rodriguez were responding to the welfare call at Ms. Craddock's home, there were no circumstances present that would suggest that Ms. Craddock did not have a right to possess a rifle on her own property and her possession of the rifle did not constitute probable cause to arrest her for any crime.

199.    Defendants Chernewsky and Rodriguez knew Ms. Craddock was alive and well and uninjured, and they exceeded their authority under the welfare check by pointing their shotguns at Ms. Craddock and ordering her to obey their commands.

200.    Ms. Craddock directed defendants Chernewsky and Rodriguez to get off of her property, and when the defendants Chernewsky and Rodriguez failed to leave they became trespassers.

201.    Ms. Craddock was conscious of her confinement by defendants Chernewsky and Rodriguez and subsequently by other law enforcement officers.

202.    Ms. Craddock suffered a warrantless seizure or arrest without probable cause.

203.    Defendants Chernewsky and Rodriguez did not have probable cause to seize or arrest Ms. Craddock.

204.    Defendants Chernewsky and Rodriguez did not have a warrant to seize or arrest Ms. Craddock.

205.    Ms. Craddock did not consent to defendants Chernewsky and Rodriguez's confinement of her.

206.    The confinement of Ms. Craddock was not otherwise privileged.

207.    As a direct, legal and proximate result of defendant Rodriguez's unconstitutional acts, plaintiff Craddock was seriously injured; plaintiff suffered extensive physical injuries and was eviscerated; plaintiff required multiple surgeries and a lengthy hospitalization; plaintiff suffered pain and suffering; plaintiff suffers ongoing physical pain; plaintiff Craddock was confined without authority; plaintiff suffers constant pain from metal fragments from the 70mm rifled slug that can not be removed; plaintiff suffered mental anguish and stress; plaintiff has permanent physical injuries and pain; plaintiff has other injuries and pain; plaintiff is disabled; and plaintiff endured violations of her Fourth and Fourteenth Amendment rights.

WHEREFORE, plaintiff demands judgment against defendants Chernewsky and Rodriguez individually and jointly and prays for relief as follows:

(a)    That she be compensated for violation of her constitutional rights, pain, suffering, and humiliation in the amount of $10,000,000; and

(b)    That she be compensated for the costs and disbursements of this action; and

(c)    That she be compensated for attorney's fees; and

(d)    For such other and further relief as the Court may deem just and
proper.

## FOURTH CLAIM

208.    The allegations contained in paragraphs 1 through 207 are hereby repeated
and re-alleged as if fully set forth herein.

209.    Plaintiffs' fourth claim is against defendant Investigator Hogencamp for
violation of plaintiffs' clearly established rights to be free from malicious prosecution under
the Fourth and Fourteenth Amendments to the United States Constitution.

210.    Defendants Chernewsky and Rodriguez, without reasonable or probable
cause, illegally and without a warrant, and without any right or authority to do so, arrested
or seized Ms. Craddock on July 15, 2021.

211.    In arresting Ms. Craddock's freedom of movement on July 15, 2021 and
thereafter, the defendants intended to confine her.

212.    On July 16, 2021, defendant Hogencamp wrote and submitted two Felony
Complaints to be filed to the Town of New Lebanon Local Criminal Court which charged
Ms. Craddock with criminal possession of a weapon in the third degree in violation of Penal
Law 265.02 and menacing a police officer in violation of Penal Law 120.18.

213.    Defendant Hogencamp was personally and actively involved in initiating the
criminal prosecution against Ms. Craddock by swearing out and filing the two Felony
Complaints.

214.    While still in Albany Medical Center Hospital recovering from multiple

surgical procedures from defendant Chernewsky having shot her in the back, on July 16, 2021 Ms. Craddock appeared for a virtual arraignment before Hon. Barry Sack, Town of Greenport Town Court, based on the two felony complaints brought by defendant Hogencamp.

215.    Because Ms. Craddock was only semi-conscious during most of the virtual arraignment and did not understand what was happening to her and was not aware of what rights she was being asked to waive, the virtual arraignment before Justice Sack in the hospital was nullified.

216.    The action against Ms. Craddock was then transferred to the Town of New Lebanon Town Court where she appeared on July 28, 2021 after being discharged from Albany Medical Center Hospital.

217.    At the Town of New Lebanon Town Court, Ms. Craddock appeared before Justice Jessica Byrne where she was arraigned on the two felony complaints for criminal possession of a weapon in the third degree and menacing a police officer. Justice Byrne did not conduct a probable cause hearing as to the charges, did not conduct a bail hearing, or enter a waiver of indictment or superior court information because Ms. Craddock was still recovering from the injuries inflicted by Trooper Chernewsky and was bleeding and struggling while in court.

218.    Justice Byrne saw that Ms. Craddock was bleeding, adjourned the matter for a preliminary hearing to be held on July 30, 2021, and directed that an ambulance be called to bring Ms. Craddock back to Albany Medical Center Hospital.

219.    No preliminary hearing or probable cause determination for the two felony complaints against Ms. Craddock was ever held.

220.    On August 3, 2021, Ms. Craddock was discharged from Albany Medical Center Hospital and transported to the Columbia County Jail.

221.    Ms. Craddock was conscious of the defendant Hogencamp's confinement of her.

222.    Ms. Craddock did not consent to defendant Hogencamp's confinement of her.

223.    The confinement was not otherwise privileged.

224.    Ms. Craddock was not held for the action of a grand jury.

225.    There was no probable cause to believe the prosecution of Ms. Craddock for criminal possession of a weapon in the third degree or menacing a police officer should be commenced or proceed.

226.    Defendant Hogencamp was motivated by malice and reckless indifference in initiating the prosecution against Ms. Craddock.

227.    Defendant Hogencamp's motivation for bringing the criminal charges against Ms. Craddock was to cover up that defendant Chernewsky had shot Ms. Craddock in the back without probable cause.

228.    Defendant Hogencamp was personally and actively involved in the commencement and continuation of criminal prosecution against Ms. Craddock.

229.    Defendant Hogencamp lacked probable cause to continue the criminal prosecution against Ms. Craddock.

230.    The charge of criminal possession of a weapon in violation of Penal Law 265.02 was made without probable cause because defendant Hogencamp knew, or should have known, that the .22 rifle unlawfully seized by the defendants was inoperable; the inoperability of the rifle was obvious because it was missing the bolt and firing pin which were conspicuously absent from the rifle; the inoperability was open and plain; and operability of the firearm is an element of criminal possession of a firearm in violation of Penal Law 265.02.

231.    The charge of criminal possession of a weapon in violation of Penal Law 265.02 was made without probable cause because defendant Hogencamp was unable to provide evidence of or substantiate Ms. Craddock being convicted of a felony charge on any previous occasion, and without an underlying qualifying felony charge she could not be convicted of criminal possession of a weapon in the third degree.

232.    Defendant Hogencamp lacked probable cause to bring the charge of criminal possession of a weapon in violation of Penal Law 265.02.

233.    The charge of menacing a police officer in violation of Penal Law 120.18 was made without probable cause and/or relied on misrepresented and falsified evidence provided by defendants Chernewsky and Rodriguez, who lied and stated that Ms. Craddock aimed the .22 rifle at defendant Chernewsky and defendant Rodriguez when in reality Ms. Craddock held the rifle down at her side, she did not move toward defendant Chernewsky, and she did not aim at defendant Chernewsky, in order to excuse defendant Chernewsky's shooting of Ms. Craddock in her back.

234.    Defendant Hogencamp was motivated by malice and reckless indifference in continuing the criminal proceedings against plaintiff which were brought in order to excuse defendant Chernewsky's shooting of Ms. Craddock in her back.

235.    Defendant Hogencamp was motivated by malice and reckless indifference in continuing the criminal proceedings against plaintiff which were brought in order to cover up that defendant Chernewsky had shot Ms. Craddock in her back.

236.    Defendant Hogencamp misrepresented and falsified evidence to the effect that Ms. Craddock "aim[ed] a Ruger American 22 win mag … at Trooper Nathan J. Chernewsky and Trooper Erica Rodriguez" in order to justify and excuse defendant Chernewsky's shooting of Ms. Craddock in her back.

237.    Defendant Hogencamp withheld exculpatory evidence from the prosecution and plaintiff when he failed to timely produce evidence in the possession of the New York State Police Department prior to November 2, 2022.

238.    By July 29, 2022 the People, as a result of the failure of defendant Hogencamp to provide pertinent documentation of their investigation, had not provided extensive Criminal Procedure Law (CPL) 245 and Brady material related to the New York State Trooper investigation of the shooting of Ms. Craddock.

239.    On November 2, 2022 the People provided a revised discovery package to the defense disclosing significant new CPL 245 material, much of which is exculpatory Brady material. The November 2, 2022 discovery package consisted of approximately 4,000 pages of additional and previously undisclosed CPL 245 material.

240.    The November 2, 2022 discovery package provided by Trooper Hogencamp to the Columbia County District Attorney and eventually to Ms. Craddock's defense counsel included a 278-page document created by New York State Police investigators that was the result of a comprehensive investigation of the shooting of Ms. Craddock, including a fourteen page transcript of an interrogation of defendant Chernewsky conducted on January 18, 2022; a fourteen page transcript of the interrogation of defendant Rodriguez conducted on February 1, 2022; supporting depositions of other responding State Troopers and other law enforcement members, emergency medical healthcare providers, and other witnesses; blood alcohol lab results; crime scene reconstruction maps; aerial photographs and scene mapping; and a Comprehensive Incident Report listing all individuals consulted during the investigation of the shooting.

241.    The majority of the documents in the November 2, 2022 discovery package were dated from July and August 2021, and had been available but were withheld by defendant Hogencamp. The latest dated documents in the November 2, 2022 discovery package was the transcript of defendant Rodriguez's deposition with State Trooper investigators which was conducted February 1, 2022, which occurred ten (10) months prior to Ms. Craddock's receipt of the discovery package, while the deposition of defendant Chernewsky had occurred on January 18, 2022.

242.    The New York State Troopers and defendant Hogencamp engaged in a dilatory production of records and documents, failing to provide necessary discoverable <u>Brady</u> and CPL 245 information to the People which demonstrates actual malice.

243.    Defendant Hogencamp misrepresented, falsified, and withheld evidence throughout all phases of the criminal prosecution of Ms. Craddock.

244.    As a result of the prosecution, Ms. Craddock suffered post-arraignment liberty restraints and was forced to retain and pay an attorney to defend her against the criminal proceedings commenced by defendant Hogencamp.

245.    On August 10, 2023, Hon. Richard M. Koweek, Columbia County Court Judge, issued a Decision and Order which dismissed the criminal charges against Ms. Craddock on the basis that the prosecution failed to be ready for trial against Ms. Craddock within 180 days in violation of her constitutional right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution.

246.    Judge Koweek's Decision and Order specifically mentions that the November 2, 2022 discovery production consisted of records and documents that had been available to the People at the time of their first production but was not actually produced:

> While [the People] assert that they had 'extensively responded to defendant's discovery demands in December, 2022', they do not specifically deny that much of the material identified by Defendant was available early on in the process, likely in the possession of the State Police and was not part of the original [Certificate of Compliance] and [Statement of Readiness]. Rather, they claim that they turn over 'new material information and documents from the State Police' as they receive it."

247.    As a direct, legal and proximate result of defendant Investigator Hogencamp's unconstitutional acts, plaintiff Craddock was seriously injured; plaintiff suffered extensive physical injuries and was eviscerated; plaintiff required multiple surgeries and a lengthy hospitalization; plaintiff suffered pain and suffering; plaintiff suffers ongoing physical pain;

plaintiff Craddock was confined without authority; plaintiff suffers constant pain from metal fragments from the 70mm rifled slug that can not be removed; plaintiff suffered mental anguish and stress; plaintiff has permanent physical injuries and pain; plaintiff has other injuries and pain; plaintiff is disabled; and plaintiff endured violations of her Fourth and Fourteenth Amendment rights.

WHEREFORE, plaintiff demands judgment against defendant Hogencamp individually and jointly and prays for relief as follows:

(a)    That she be compensated for violation of her constitutional rights, pain, suffering, and humiliation in the amount of $10,000,000; and

(b)    That she be compensated for the costs and disbursements of this action; and

(c)    That she be compensated for attorney's fees; and

(d)    For such other and further relief as the Court may deem just and proper.

## FIFTH CLAIM

248.    The allegations contained in paragraphs 1 through 247 are hereby repeated and re-alleged as if fully set forth herein.

249.    Plaintiff's fifth claim is for injunctive relief against defendants Superintendent Kevin P. Bruen and Trooper Chernewsky seeking to declare that the Superintendent's Commendation Award given to Trooper Chernewsky on or about May 11, 2022 is invalid because it resulted from fabricated evidence designed to cover up the violation of Ms.

Craddock's constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments and the possession of the Superintendent's Commendation Award by Trooper Chernewsky is a continuing and ongoing violation of Ms. Craddock's constitutional rights.

250.    Based on a New York State Police press release, on or about May 11, 2022 Kevin P. Bruen, the Superintendent of the New York State Police Department, awarded the Superintendent's Commendation Award to defendant Chernewsky.

251.    During the award ceremony defendant Superintendent Bruen stated that the Superintendent's Commendation Awards were given to recognize officers for "their perseverance and dedication" and "selflessly putting others first" as follows:

> "Today, we take the time to congratulate and recognize State Police employees who consistently show their perseverance and dedication to our agency and state. These members and civilians honored today – are the best of an agency filled with brave and courageous leaders who are diligent and ready to serve. To our award recipients, I thank you for selflessly putting others first and making New York State a better place to live."

252.    Defendant Superintendent Bruen commended defendant Chernewsky when he awarded the Superintendent's Commendation Award  for taking "the necessary action to contain the subject [Sarah Craddock]" and commending him for "immediately render[ing] first aid, which contributed to her survival" as follows:

> "On July 15, 2021, Trooper Chernewsky responded to a suicidal subject call in the town of New Lebanon. Immediately recognizing both the volatility of the situation and the armed female subject, he ensured the safety of arriving officers and emergency personnel by communicating the potential threat, directing them to establish a secure perimeter, all while taking cover. When the subject became agitated, aiming her firearm at Trooper Chernewsky and

another Trooper, and refusing to comply with commands to disarm, he took the necessary action to contain the subject, and then immediately rendered first aid, which contributed to her survival. Trooper Chernewsky's composure and leadership in this situation merits his receipt of the Superintendent's Commendation Award."

253.    Defendant Superintendent Bruen making the Award to defendant Chernewsky constitutes an endorsement of the false narrative of events described within the commendation and constitutes the ongoing position by the New York State Police Department that defendant Chernewsky's employment of excessive force against Ms. Craddock complied with State policy.

254.    The language contained in the Superintendent's Commendation Award is fabricated and fraudulent and represents an effort by defendant Superintendent Bruen to cover up the violation of Ms. Craddock's constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments, when in reality defendant Chernewsky shot Ms. Craddock in the back without any justification.

255.    The Award claims that defendant Chernewsky "ensured the safety of arriving officers and emergency personnel by communicating the potential threat, [and] directing them to establish a secure perimeter." Defendant Chernewsky did not "direct" anyone to establish a secure perimeter. Defendant Chernewsky reported to dispatch that Ms. Craddock was "inside, in the kitchen. She doesn't know I'm here, I saw her through a window", and the New York State Police dispatcher responded by stating that "Any available other patrol [responding to Ms. Craddock's home] set up a perimeter and a detail." Defendant Chernewsky did not direct that a perimeter be set up, but he did take shelter

behind his Trooper vehicle and pointed a shotgun at Ms. Craddock and ultimately shot her in the back. Trooper Chernewsky's conduct went beyond establishing a perimeter when he confronted Ms. Craddock by calling her to come out of her home and started giving her orders before the hostage negotiators arrived.

256.    The Award claims that Ms. Craddock was "refusing to comply with commands to disarm" but in reality Ms. Craddock, who was holding the inoperable rifle down towards the ground, was turning to return to her basement when defendant Chernewsky shot her in the back.

257.    The Award claims that Ms. Craddock "became agitated, aiming her firearm at Trooper Chernewsky and another Trooper", but in reality Ms. Craddock did not and could not aim a firearm at "Trooper Chernewsky and another Trooper" because she could not see Trooper Chernewsky who was hidden from Ms. Craddock's view by a large bush and she was turning away from the Troopers to return to her basement. Ms. Craddock never aimed the .22 rifle at defendant Chernewsky, and the statement that she did is false.

258.    Defendant Chernewsky shot Ms. Craddock in the back when she was turning to return to her home through the open door to the basement, and his conduct of shooting Ms. Craddock in the back was not "necessary action to contain the subject" and his conduct constitutes a violation of Ms. Craddock's constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments.

259.    The Award claims that defendant Chernewsky "immediately rendered first aid", but in reality defendant Chernewsky remained hidden behind cover behind his

Trooper vehicle from 10:25:19 AM until he shot her in the back from behind his Trooper vehicle at 10:31:59 AM and remained there until 10:34:00 as Trooper Rodriguez secured Ms. Craddock and began providing life-saving assistance to her.

260.    Defendant Rodriguez was the first officer to approach Ms. Craddock after she was shot in the back by defendant Chernewsky, and Chernewsky stayed under cover behind his Trooper vehicle while Rodriguez approached Ms. Craddock.

261.    Defendant Rodriguez approached Ms. Craddock while she was lying on the concrete basement entrance with her intestines outside of her body after suffering an evisceration from defendant Chernewsky shooting her in the back.

262.    Defendant Rodriguez determined that Ms. Craddock was still alive and immediately began rendering emergency first aid by pushing Ms. Craddock's intestines back inside her body, placing pressure on the wound to keep her intestines contained in her body, and keeping Ms. Craddock conscious and speaking until paramedics could arrive, all of which contributed to Ms. Craddock's survival.

263.    As defendant Rodriguez and a Columbia County Deputy Sheriff continued to provide life-saving medical aid to Ms. Craddock, defendant Chernewsky sat in the grass approximately 15 feet from Ms. Craddock and then was helped up by other State Troopers and directed to sit in his Trooper vehicle with the air conditioner on.

264.    The entirety of the Superintendent's Commendation Award is evidence of the New York State Police Department's false narrative to cover up the facts and circumstances of defendant Chernewsky's shooting of Ms. Craddock in the back following his dispatch to

her property for a welfare check.

265.    The United States District Court, Northern District of New York, has authority under the Fourth and Fourteenth Amendments to grant prospective equitable relief to prevent ongoing acts that are illegal under the Constitution of the United States and this relief is not barred by an application of immunity under the Eleventh Amendment.

266.    Although it contains a false narrative of events, the Superintendent's Commendation Award endorses a violation of Ms. Craddock's constitutional rights which nonetheless will allow defendant Chernewsky to argue to a jury at trial that his receipt of the Superintendent's Commendation Award is a defense to his actions.

267.    The Superintendent's Commendation Award to Trooper Chernewsky is prejudicial and damaging to Ms. Craddock because defendant Chernewsky will cite the award as a justification for his use of excessive force when he shot Ms. Craddock in the back.

268.    As a direct, legal and proximate result of defendant New York State Police Superintendent Kevin P. Bruen's unconstitutional acts, plaintiff Craddock has and will continue to suffer from ongoing acts of the defendants in violation of her federal rights under the United States Constitution, and the Superintendent's Commendation Award should be declared invalid and null and void.

WHEREFORE, plaintiff demands judgment against defendants Bruen and Chernewsky individually and jointly and prays for relief as follows:

(a)    That the Superintendent's Commendation Award issued by Superintendent Kevin B. Bruen to Trooper Chernewsky on May 11,

2022 by declared invalid and null and void; and

(b)      That defendant Cherenwsky is prohibited and enjoined from citing the Superintendent's Commendation Award in his favor during the proceedings and during trial of Ms. Craddock's litigation pursuant to 42 USC 1983 pending in the United States District Court, Northern District of New York; and

(c)      That plaintiff be compensated for the costs and disbursements of this action; and

(d)      That she be compensated for attorney's fees; and

(e)      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

269.    Plaintiff demands a jury trial in this action on each and every one of the claims.

Dated: ALBANY, NEW YORK
             NOVEMBER **30** , 2023

_Lewis B. Oliver, Jr._

LEWIS B. OLIVER, JR., ESQ.
Bar Roll No. 102303
Oliver Law Office
Attorney for Plaintiff Craddock
156 Madison Avenue
Albany, New York 12202
518-463-7962